IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DEBRA J. JEREMIAH,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　　　　　 )　Case No. 3:16-01373-JPG-CJP
　　　　　　　　　　　　　　　　　　　　)
NANCY A. BERRYHILL,　　　　　　　　　)
Acting Commissioner of Social Security,　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　Defendant.[1]　　　　　　　　 )

## MEMORANDUM AND ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Debra J. Jeremiah seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff filed for DIB in October 2012, alleging a disability onset date of January 31, 2010. (Tr. 177-82, 183-84.) Plaintiff's claim was initially denied, and then again at the reconsideration level. (Tr. 77, 91.) She requested an evidentiary hearing, which Administrative Law Judge (ALJ) Kevin Martin conducted in December 2014. (Tr. 112-13, 39-65.) ALJ Martin issued an unfavorable opinion in May 2015 and the Appeals Council denied plaintiff's request for review, rendering the ALJ's decision the final agency decision. (Tr. 17-38, 1-7.) Plaintiff exhausted all of her administrative remedies and filed a timely complaint with this Court. (Doc. 1.)

### Plaintiff's Arguments

Plaintiff makes the following arguments:

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017). She is automatically substituted as defendant in this case. *See* FED. R. CIV. P. 25(d); 42 U.S.C. §405(g).

1

1. The ALJ improperly weighed the medical opinions.
2. The ALJ's credibility determination was erroneous.

## **Applicable Legal Standards**

To qualify for DIB and SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

> ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, the Court must determine: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) ([u]nder the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that the Commissioner made no mistakes of law. This scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but only whether the ALJ's findings were supported by substantial evidence and whether the ALJ made any errors of law. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence: "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). While judicial review is deferential, however, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The ALJ's Decision**

ALJ Martin followed the five-step analytical framework set forth above. He determined plaintiff met the insured status requirements through March 31, 2015 and had not engaged in substantial gainful activity since her alleged onset date of January 31, 2010. (Tr. 22.) The ALJ opined plaintiff had severe impairments of degenerative disc disease (DDD) of the lumbar spine status post fusion; obesity; carpal tunnel syndrome; diabetes with neuropathy; status post right hand fracture; status post left wrist fracture; status post rib fractures; major depressive disorder; and pain disorder. (Tr. 23.) The ALJ then determined plaintiff had the RFC to perform sedentary work, with several restrictions. (Tr. 24.) Although plaintiff could not perform any

past relevant work, she was capable of performing other jobs that existed in the economy and was, therefore, not disabled. (Tr. 31-32.)

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1. Agency Forms**

In her disability report, plaintiff indicated DDD of the lumbar spine, spinal stenosis, a lumbar fusion with hardware, and diabetes limited her ability to work. She weighed 226 pounds and was five-foot, six-inches tall. (Tr. 213.)

Plaintiff worked as a caregiver in 1997, as a cashier from 1995 to 1996, and as a dispatcher from 1999 to 2010. (Tr. 215.) She struggled with pain in her lower back for several years, and the condition progressively worsened until she became unable to work in January 2010. She tried several treatment options, including physical therapy, injections, and a lumbar fusion with hardware in 2006. She had difficulty walking, standing, and sitting for significant periods. She also had difficulty lifting, carrying, bending, twisting, turning, kneeling, and squatting. Plaintiff struggled with falling and staying asleep at night. Her concentration and focus were impaired because of pain and fatigue. Plaintiff also had diabetes, which she controlled with diet. (Tr. 220.)

Plaintiff completed a function report in December 2012. She stated in the mornings, she prepared coffee, made sure her kids woke up and got ready for school, watched television, and folded laundry. In the afternoons, plaintiff prepared lunch and then watched television, read, sewed, and crocheted. Plaintiff took about an hour-long nap then socialized with her children

after they returned home from school.  In the evening, she prepared dinner, watched television, and socialized with her family.  She showered and went to bed around 10:30 p.m.  (Tr. 255.)

Plaintiff struggled to reach around to fasten her bra, avoided bending down while dressing, and needed to sit and rest after putting on her clothes.  She struggled to climb in and out of the shower and took short showers to avoid standing for long periods.  She also experienced difficulty bending to wash her legs and feet.  After showering, plaintiff had to rest.  She had trouble reaching up to wash and style her hair.  Plaintiff sometimes struggled to hold on to cups.  (Tr. 226.)

Plaintiff prepared simple meals but she had difficulty standing and walking.  She struggled to bend over to get pots and pans out of the cabinets, carry pots and pans of food, and follow recipes.  At times, she lacked the motivation to cook.  (Tr. 227.)

Plaintiff washed dishes two to three times each week, folded laundry daily, and swept floors twice per week.  However, her children helped with the dishes and washed the laundry so plaintiff would not have to lift and carry the clothes.  Plaintiff's son used the dustpan when plaintiff swept so she did not have to bend.  Plaintiff was able to drive a car, but had trouble getting in and out of her vehicle, sitting in a vehicle without switching positions, and reaching to put on her seatbelt.  She also had problems turning to check for traffic.  (Tr. 228-29.)

Plaintiff grocery shopped twice per month.  She leaned against the cart for support and struggled to reach and bend when getting items off the shelves.  She had to rest while walking through the store and relied on someone else to carry the bags.  Plaintiff was able to pay bills, count change, handle a savings account, and use a checkbook.  (Tr. 229.)

Plaintiff sometimes experienced difficulty sewing and crocheting.  (Tr. 230.)  She struggled to lift and carry groceries and laundry baskets because of back pain, weakness, and

6

fatigue. She struggled to sit for more than twenty to thirty minutes at a time and needed to take frequent rest breaks during the day to complete all of her tasks. (Tr. 235-36.)

    **2. Evidentiary Hearing**

ALJ Martin conducted an evidentiary hearing in December 2014. (Tr. 41-65.) Plaintiff's attorney stated that plaintiff was a younger individual with a high school education. She previously worked as a dispatcher, which was sedentary, semi-skilled work. Plaintiff's impairments included significant DDD of the lumbar spine. She underwent an inner body fusion at the L5-S1 and more recent images showed spinal stenosis at the L4-L5 level. Plaintiff experienced pain, which was consistent with radicular symptoms. Plaintiff also had a history of carpal tunnel syndrome. In May 2013, she sat on her husband's motorcycle, fell, and broke her left wrist. Plaintiff also had type II diabetes and major depressive disorder. She had an altered gait and used a cane at the hearing. Plaintiff would require additional accommodations or would miss work, such that she would not be able to maintain even sedentary work. (Tr. 43-45.)

Plaintiff lived with her husband, daughter, and two grandchildren. Her grandchildren were four years old and two months olds. Plaintiff had a driver's license but was always uncomfortable when driving. She drove to the hearing, which took her about forty-five minutes. (Tr. 45-46.)

Plaintiff weighed 200 pounds after unintentionally losing fifty pounds throughout the previous six months. (Tr. 46.) She began using a cane two weeks prior to the hearing because she was constantly falling. (Tr. 47.) Plaintiff fell about three or four times a week and most recently fell the morning of the hearing. (Tr. 51-52.)

Plaintiff had difficulty sitting, standing, and lying down. Her pain was located between her shoulder blades, and down her back and left leg. On a scale of one to ten, she rated her pain

7

a six or seven on a daily basis. The pain was constant and physical activity made it worse. Plaintiff took Lortab, Gabapentin, and Voltaren. (Tr. 50.) These medications lowered the pain to a five or six. (Tr. 51.)

Plaintiff experienced pain since 2010 and it worsened over time. She attended pain management, which did not help, although she was scheduled to begin again the following month. (Tr. 51.)

Plaintiff had carpal tunnel in both hands, dating back a year, which caused her to drop things. She did not receive treatment for carpal tunnel, but Dr. Chowdry recommended surgery. The condition worsened over the previous six months. A nerve conduction study showed moderate to severe carpal tunnel in the right hand and "it was just starting in [the] left hand." Plaintiff used wrist splints every day and was recommended to use them at night as well. She forgot to put them on the day of the hearing. Plaintiff did not believe the splints were helping because her hands went numb and tingled. (Tr. 53-54.)

Plaintiff suffered from depression for about a year and a half, which caused her to burst out crying for no reason. These episodes occurred about two to three times each week. She stopped taking her depression medication three months before. Plaintiff was never recommended therapy or counseling. (Tr. 55-56.)

Plaintiff's daughter helped a lot with cooking and housework. Plaintiff was able to dust at arm's level and grocery shop with her husband. She did not go by herself due to a fear of falling. Plaintiff did not babysit her grandchildren because she could not run after them. She exercised very little, but tried to walk around to prevent stiffness. Plaintiff could no longer sew or crochet and had not done so for four years. (Tr. 56-58.)

Plaintiff visited her parents' house every day for about five to eight hours because her mother was battling cancer. Her parents lived eighteen miles away and she spent the time sitting and talking to them. (Tr. 58.) Plaintiff used a computer to get on Facebook. She had a couple of friends that came over two to three times each week. (Tr. 59.)

Plaintiff could sit for about twenty to thirty minutes at a time. She could stand for maybe ten minutes and could not walk very far. Plaintiff could lift and carry about five pounds. (Tr. 59-60.)

A vocational expert (VE) then testified regarding several hypothetical individuals with various functional limitations who had plaintiff's age, education, and work experience. The VE testified that an individual with the ultimate RFC finding would not be able to perform plaintiff's previous work, but could perform other jobs that existed in the national economy. (Tr. 61-64.)

### 3. Medical Records

Plaintiff treated with Coulterville Medical Clinic throughout the relevant period. Her diagnoses included chronic back pain, depression, and type II diabetes, for which she was prescribed Lexapro, Augmentin, hydrocodone, Lortab, Norflex, Naprosyn, Vicodin, and Toradol, at various points. (Tr. 328-61, 412.)

In October 2011, an MRI of plaintiff's lumbar spine showed spondylosis with evidence of central spinal canal stenosis at the L4-5 level. There was also left-sided neural foraminal encroachment. (Tr. 373.) Plaintiff was referred to Dr. Christopher Heffner, a neurosurgeon, who performed an anterior L5-S1 BAK fusion on plaintiff several years before. (Tr. 336-37, 367.)

Plaintiff returned to Dr. Heffner in July 2012 with complaints of increasing lower back pain. Plaintiff reported using Lortab, Norflex, and a TENS unit with some improvement, but she continued to experience pain on a daily basis. Straight leg raising was positive on the left side at

9

fifteen degrees and on the right side at thirty degrees. Her motor strength was normal and her sensation was intact throughout. She walked slowly due to pain. Dr. Heffner diagnosed plaintiff with adjacent level spinal stenosis and status post lumbar fusion. He recommended physical therapy and facet and epidural injections. (Tr. 367.) Images of plaintiff's lumbar spine demonstrated degenerative postoperative changes but nothing acute. (Tr. 372.)

In August 2012, plaintiff presented to Memorial Hospital with complaints of low back and bilateral leg pain, which interfered with her ability to sleep and worsened with most activities of daily living (ADLs). Plaintiff underwent physical therapy with no overall improvement. Images of her lumbar spine from May 25, 2012 demonstrated anterior fusion at the L5-S1 level, spondylosis at the L4-5 level with mild central stenosis, and bilateral neuroforaminal encroachment. Plaintiff was assessed with lumbar post laminectomy syndrome; L4-5 degenerative spinal stenosis with left radiculitis; chronic lumbar strain syndrome with deconditioning and mild obesity; and depression/anxiety with insomnia. The physician noted plaintiff had considerable biomechanical dysfunction related to low back pain and demonstrated symptoms that may suggest discogenic pathology. He stated plaintiff may require diagnostic facet blocks, given the significance of facet arthropathy and ongoing tenderness over the facet joints, which worsened with lumbar extension. There was mild tenderness over the sacroiliac joints as well. (Tr. 379-80, 464-71.)

In September 2012, plaintiff received two lumbar epidural steroid injections. (Tr. 375-78.) She presented to Dr. Heffner later that month and reported the injections were not effective. Dr. Heffner reviewed plaintiff's x-rays and noted excellent fixation at L5-S1 with solid bone growth. On physical examination, plaintiff's strength was normal but she had pain when bending forward at the waist. She also had generalized lumbar spinal tenderness. Straight leg

raising caused back pain bilaterally at fifteen degrees. Dr. Heffner opined plaintiff should undergo a lumbar myelogram with post myelogram CT to determine the amount of stenosis. (Tr. 366.)

On November 5, 2012, plaintiff presented to Dr. Heffner and reported significant back pain and bilateral leg pain when standing and walking. On physical examination, a straight leg raise was negative, but Dr. Heffner noted pronounced pain across plaintiff's lower back when bending and twisting. There was also diffuse tenderness across plaintiff's lumbar area. Dr. Heffner again recommended a myelogram study. (Tr. 365.)

Plaintiff underwent a lumbar myelogram with post CT lumbar myelogram on November 14, 2012, which demonstrated uncomplicated, mature bony fusion at L6-S1; mild spondylosis and facet arthropathy resulting in mild spinal canal stenosis; no significant foraminal stenosis; no evidence of arachnoiditis; and bilateral adrenal adenomatous changes or hyperplasia. (Tr. 368-71.)

On November 29, 2012, Dr. Heffner noted plaintiff's myelogram looked "quite good," and she did not have significant adjacent level stenosis. The bone growth at her prior fusion was extremely solid and in a very good position. Dr. Heffner did not recommend surgery and started plaintiff on Neurontin and Voltaren. (Tr. 364.)

In March 2013, plaintiff presented to Dr. Heffner and reported chronic low back pain, numbness in her legs, and difficulty walking. Dr. Heffner opined plaintiff's situation was permanent and prevented her from performing heavy activities. She was unable to do any significant lifting, bending, or twisting, which rendered her unable to perform work activity. Plaintiff also reported numbness and tingling in her right hand. On physical examination, Phalen's test was negative, there was lost sensation over the thumb, index, and middle finger of

the right hand compared to the left, and her reflexes were 2+ and equal.  Dr. Heffner recommended a nerve conduction test and wrist splint.  (Tr. 387.)

In April 2013, plaintiff underwent a nerve conduction test, which demonstrated moderate right median neuropathy across the wrist and borderline mild median neuropathy across the left wrist.  (Tr. 389.)  She then presented to Dr. Heffner and reported continuing numbness and pain in her right hand, which was better with the use of a splint at night.  Dr. Heffner stated the nerve conduction test did show evidence of right-sided carpal tunnel syndrome.  (Tr. 386.)

On May 2, 2013, plaintiff presented to Sparta Community Hospital with left rib and wrist pain.  She stated "she was on her new bike and laid it over falling onto the [left] and hurting her [left] wrist and [left] ribs."  (Tr. 428.)  Images of her left ribs were negative and image of her left wrists showed mildly displaced intraarticular fracture of the distal left radius and ulna.  (Tr. 433.)  Plaintiff presented to Coulterville Medical Clinic a couple weeks later with continued left rib pain.  The nurse practitioner noted that plaintiff was wearing a short arm cast and experienced "L rib pain since falling off Motorcycle."  The nurse practitioner planned x-rays of plaintiff's left ribs and chest and advised plaintiff to follow-up in a week.  (Tr. 397-400.)

At plaintiff's follow-up appointment, plaintiff reported she was improving but still complained of pain in her ribs and lower extremities.  She was advised to follow-up in three weeks.  (Tr. 401-03.)

In June 2013, images of plaintiff's left wrist demonstrated healing mildly impacted fractures of the distal left radius and ulna, in a stable position.  (Tr. 499.)  Images of her left ribs showed healing left anterior third, fourth, fifth, and sixth ribs.  (Tr. 500.)  Images of her right hand demonstrated a minimally displaced fracture of the distal right fifth metacarpal.  (Tr. 501.)

12

In December 2013, plaintiff presented to Coulterville Medical Clinic and reported her wrist was still painful and she experienced decreased range of motion and strength. Plaintiff's nurse practitioner referred plaintiff to Dr. Mirly for her wrist and noted possible neuropathy from plaintiff's chronic back pain. (Tr. 481-84.) Plaintiff followed-up two weeks later and stated her left wrist pain and decreased range of motion were worsening. She continued to experience back pain and wished to increase her depression medication. Plaintiff's Gabapentin was increased and her Lexapro and Wellbutrin were continued. Plaintiff declined a referral to counseling. (Tr. 485-88.)

In February 2014, plaintiff presented to Memorial Hospital with complaints of back and lower leg pain. Her pain reportedly increased with sitting, standing, walking, and changing positions. The pain woke her up at night. On physical examination, lower lumbar paraspinal pain was present and plaintiff demonstrated poor range of motion with all movements. Straight leg raise increased pain and Patrick's test caused increased left SI joint pain and hip pain. Her deep tendon reflexes to the lower extremities were 2+, bilaterally. Muscle strength was 5/5 bilaterally. Plaintiff was diagnosed with lumbar spondylosis with mild central cord stenosis, chronic lumbar pain with prominent facet arthropathy L4-L5, lumbar fusion L5-S1 with BAK, and bilateral leg pain. Plaintiff was scheduled for lumbar epidural steroid injections on the left side. (Tr. 508.)

In March 2014, plaintiff received a translaminar epidural steroid injection. (Tr. 512.) She returned for a repeat injection in April 2014. (Tr. 517-18.)

In May 2014, plaintiff presented to Dr. Heffner with complaints of pain in her back and left leg. She reported that the lumbar epidural injections did not provide any relief. On physical examination, straight leg raising was markedly positive on the left side and negative on the right.

13

Strength was normal and reflexes were 1+ in the right knee and ankle, trace at the left knee and ankle. Plaintiff's gait was slow due to pain. Dr. Heffner noted that plaintiff previously had a lumbar fusion and had significant lumbar radiculopathy in her left lower extremity with low back pain. He arranged for an MRI and x-rays of her lumbar spine. (Tr. 543.) The images were completed in June 2014. They demonstrated postoperative changes of the lowermost lumbar disc. There was no evidence of acute fracture, frank subluxation, or bony destruction. (Tr. 544.) The MRI showed spondylosis at L3-4 and L4-5 with evidence of canal stenosis at the L4-5 level. Redemonstration of postsurgical changes of the anterior fusion at the L5-S1 with left-side neural foraminal encroachment was also seen. (Tr. 545.)

In July 2014, plaintiff presented to Dr. Heffner and reported pain in her left lower extremity, and some component of back pain. Radiographic studies of her lumbar spine showed no sign of a structural problem in the area of the fusion and no instability. There was some component of adjacent level stenosis at L4-5, which was relatively mild, and there was foraminal narrowing on the left side at L4-5 and L5-S1. No disc herniation was present. Dr. Heffner believed plaintiff should avoid a fusion, and undergo a unilateral decompression on the left side at L4-5 and L5-S1. (Tr. 542.)

In September 2014, plaintiff presented to Dr. Heffner and continued to report pain. On physical examination, plaintiff demonstrated generalized lumbar spinal tenderness. Straight leg raising was positive on the left side and negative on the right. Plaintiff's strength was normal and her reflexes were 1+. (Tr. 541.)

In December 2014, plaintiff followed-up with Dr. Heffner for her back and leg pain. Pain medication helped her function but did not solve her issues. She used about six Lortab, daily, as well as anti-inflammatory medicine and Neurontin. Dr. Heffner and plaintiff discussed a left-

sided decompressive laminectomy at L4-5 and L5-S1. Plaintiff stated she could not undergo surgery at that time because she had to take care of her mother. On physical examination, plaintiff's straight leg raising was markedly positive on the left side and negative on the right. Her strength was normal in all muscle groups, sensation was intact, and reflexes were 1+. Dr. Heffner noted plaintiff was unable to work for over four years and "her work situation is unlikely to change. . . ." He stated plaintiff would always have restrictions, including ten to fifteen pound lifting limitations, no bending or twisting at the waist, and use of chronic medication. (Tr. 540.)

In February 2015, plaintiff reported only minimal improvement in her depression. On physical examination she was alert and oriented x3. She appeared to be in moderate pain, tired, sad, and tearful, and walked with a cane. Her existing medications included Glipizide, hydrocodone, Gralise, Cyclobenzaprine, and Naproxen. The nurse practitioner increased plaintiff's Lexapro and discussed the possibility of counseling. (Tr. 562-65.)

## Analysis

Plaintiff first contends the ALJ erred in assessing the opinions of plaintiff's treating neurosurgeon, Dr. Christopher Heffner.

"A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); *see* 20 C.F.R. § 404.1527(c). An ALJ may discount a treating physician's opinion if it is internally inconsistent, or inconsistent with other evidence in the record, so long as the ALJ "minimally articulate[s]" his reasons for doing so. *Clifford v. Apfel*, 227 F.3d 863, 870–71 (7th Cir. 2000).

In March 2013, Dr. Heffner opined plaintiff could not engage in "heavy activities" and was "not able to perform work activity." (Tr. 387.) In December 2014, Dr. Heffner opined

15

plaintiff had permanent restrictions, consisting of ten to fifteen pound lifting limitations, an inability to bend or twist at the waist, and the use of chronic medication. (Tr. 540.)

The ALJ ultimately accommodated for the lifting restrictions Dr. Heffner imposed by limiting plaintiff to sedentary work. ("[A] claimant can do sedentary work if he can (1) sit up, (2) *do occasional lifting of objects up to ten pounds*, and (3) occasionally walk or stand." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994) (emphasis added)). Moreover, Dr. Heffner's opinion plaintiff was unable to work is not entitled to special deference under the treating physician rule. The Regulations charge the Commissioner with determining the ultimate issue of disability, and expressly provide, "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . ." *See also Clifford*, 227 F.3d at 870 (a claimant is not entitled to DIB just because a treating physician opines the claimant is "disabled" or "unable to work."). However, the ALJ gave "little weight" to Dr. Heffner's opinions, overall, including the bending and twisting restrictions. (Tr. 31.) These restrictions were not included in the hypotheticals posed to the VE, or in the RFC determination. Thus, contrary to the Commissioner's argument, any error is not harmless.

The ALJ gave Dr. Heffner's opinions little weight because they did not comport with plaintiff's ADLs, plaintiff's ability to work fulltime in 2011, and a single instance where plaintiff allegedly rode a motorcycle.

An ALJ may properly afford less-than controlling weight to a treating source's opinions if they are inconsistent with the claimant's daily activities. *Reynolds v. Bowen*, 844 F.2d 451, 454 (7th Cir. 1988). However, in weighing the medical opinions, the ALJ cannot cherry-pick the evidence by ignoring parts of the record that conflict with his conclusion. *Myles v. Astrue*, 582

F.3d 672, 678 (7th Cir. 2009). Additionally, an ALJ cannot draw negative inferences from underdeveloped portions of the record. *See Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014).

The ALJ pointed to a function report and testimony where plaintiff indicated she washed dishes, swept floors, folded laundry, prepared light meals, and grocery shopped. The ALJ opined that Dr. Heffner's opinions were inconsistent with plaintiff "performing a full range of basic daily living tasks during the entire period at issue." (Tr. 31.) The ALJ, however, did not acknowledge plaintiff's difficulty bending and twisting when performing these activities. For instance, plaintiff stated she prepared meals but struggled when bending over to get pots and pans out of the cabinets. (Tr. 227.) She swept her floors but relied on her son to use the dustpan so she could avoid bending. (Tr. 228.) Plaintiff could drive a car but had problems turning to check for traffic. (Tr. 228.) She grocery-shopped twice per month but struggled to bend to get items from shelves. (Tr. 229.) Plaintiff also had difficulty bending down to shave and wash her legs, and sat down to dress to avoid bending. (Tr. 226.)

The ALJ improperly cherry-picked portions of the record to support his contention that plaintiff's ADLs were inconsistent with Dr. Heffner's opinions; but even if the ALJ had not cherry-picked from the evidence, minimal activities such as grocery shopping, taking care of family members, and preparing simple meals do not establish a person is capable of engaging in fulltime employment. *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014) (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). In sum, the ALJ failed to demonstrate how plaintiff's ADLs were inconsistent with Dr. Heffner's opinion that plaintiff had bending and twisting limitations, which precluded her from engaging in work activity.

The ALJ also stated Dr. Heffner's opinions were inconsistent with plaintiff working fulltime in 2011. Plaintiff admitted in a work activity report that she babysat her daughter's

17

child forty hours each week from January 2011 through April 2011, but the ALJ found this did not rise to substantial gainful activity. (Tr. 204-08.) Notably, Dr. Heffner rendered these opinions in 2013 and 2014, years after plaintiff quit babysitting. More problematic, though, the report does not indicate the physical demands required of plaintiff, and the Seventh Circuit has urged special caution in equating caring for a family member with the challenges of daily employment in a competitive environment. *Beardsley*, 758 F.3d at 838. The ALJ did not develop the issue at the hearing and the record does not otherwise indicate how plaintiff babysitting her grandchild was inconsistent with Dr. Heffner's opinions. Therefore, the ALJ's determination cannot withstand scrutiny.

A similar problem exists with the ALJs assessment of plaintiff's ability to "ride" a motorcycle. The medical records indicate plaintiff fell off a motorcycle in 2013 and injured her wrist. Plaintiff contends she was merely sitting on a parked bike when it fell over, while the ALJ interpreted the event as plaintiff actually riding a motorcycle. Ultimately, the Court "cannot assess the validity of the ALJ's determination because the record is devoid of information that might support [his] assessment. . . ." *Murphy*, 759 F.3d at 817.

The ALJ did not set forth good reasons for affording less-than controlling weight to Dr. Heffner's opinions. Thus, remand is required on this point, alone, and the Court will not address plaintiff's remaining arguments.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes plaintiff is disabled or should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues for the Commissioner to determine after further proceedings.

**<u>Conclusion</u>**

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATED:  November 7, 2017**

s/ *J. Phil Gilbert*
**J. PHIL GILBERT**
**DISTRICT JUDGE**
